# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

CHARMAGNE E. PEREZ,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　**Case No. 10-CV-698-PJC**
　　　　　　　　　　　　　　　　　　)
MICHAEL J. ASTRUE, Commissioner of the　)
Social Security Administration,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　　)

## OPINION AND ORDER

Claimant, Charmagne E. Perez ("Perez"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Perez appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Perez was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Perez was 33 years old at the time of the hearing before the ALJ on February 16, 2010. (R. 33). Perez went to school through tenth grade and then obtained a GED. *Id.*

She had last worked at a costume shop as a cashier in 2007, and she testified that they fired her because they thought she "was on something," although she asserted that she was only

taking her medications. (R. 35). She testified that she had difficulty keeping jobs due to a problem keeping on task. (R. 36-37). She had successfully worked at a club from about 1995 to 2004 because the job was unstructured, and she could make her own decisions about what to do. *Id.* At other jobs that were more structured, she couldn't stay on task or focus. (R. 36-38).

Perez testified that on a good day she would get out of bed around 9:00 a.m., but on a bad day she might stay in bed until 3:00 p.m. (R. 39). She thought good and bad days were about half and half. *Id.* She thought bad days were when she was on her "down side," with thoughts that overwhelmed her and made it difficult for her to get up. *Id.* Even on a good day, she struggled to stay up and not return to bed. (R. 40). In addition to the problems staying awake during the day, Perez had problems sleeping at night. (R. 45). Perez said that she had difficulty being in public. (R. 40). When she did go out in public, she would avoid eye contact, and she had difficulty in talking to people. (R. 41).

On manic days, she would do dangerous things like driving without having a destination, which sometimes resulted in wrecks or tickets. (R. 42). Another example was that she would start more than one project at home, such as cleaning out the closets, and then never finish the projects. *Id.*

Perez testified that she cooked, but she had to be very careful, because she would lose track of what she was doing and burn the meal. (R. 40). She did the grocery shopping, but she made out a detailed list beforehand, and it would take her two hours to shop. *Id.* She testified that her memory was not good, and she might forget some items. (R. 41). Perez testified that she had been writing poetry since she was 12 years old, but her writing had changed because it did not make as much sense. *Id.*

Perez testified that she had engaged in self-mutilation by cutting herself, but that had not

been a problem for the two years before the hearing. (R. 43). She had also had drug and alcohol issues in the past, but she testified that she had received help for those problems, and she had been sober for a while at the time of the hearing. (R. 47).

Perez' weight at the time of the hearing was about 175 pounds, but she testified that she had weighed about 115 pounds two or three years earlier. (R. 42). She believed the weight gain was due to her medications. *Id.* Perez testified that she had been taking diet pills in an attempt to lose weight, but they had caused her to go into a manic state, resulting in hospitalization. (R. 50-51).

Perez had started taking medication for bipolar disorder when she was 19, and over the years, her medications had been adjusted on multiple occasions. (R. 43-44). The medications she was on at the time of the hearing caused sleepiness and unclear thinking that she described as "fuzziness." (R. 44).

Perez testified that she had racing thoughts all the time. (R. 45-46). She had "major anxiety," and she had panic attacks that lasted for about an hour before she could calm down. (R. 47). She said that panic attacks were a problem every day with at least one attack a day. (R. 47-48). She had been diagnosed with post-traumatic stress disorder ("PTSD"), and she experienced flashbacks to traumatic events every day. (R. 48).

Perez testified that her ex-husband had been physically abusive to her and that she had injuries that affected her ability to work. (R. 50). She had experienced broken bones in her back and one ankle, as well as multiple incidents of concussions. *Id.* If she stood for about 15 minutes, her back and her ankle would start bothering her. (R. 51). Her back hurt most of the time, and she would usually lie down on the couch, rather than sit on it. (R. 52). She thought she could sit for about ten minutes before being in pain, and she could walk less than a mile. (R. 54).

She thought that she could lift about 20 pounds.  (R. 52).

Perez had been diagnosed with endometriosis, and that condition seemed to cause her more pain on her monthly cycle.  (R. 53).

Records indicate that Perez was given residential treatment at Tulsa Center for Behavioral Health in August 2005 for drug abuse.  (R. 210-29).  Her initial diagnoses on Axis I[1] were bipolar I disorder, most recent episode manic, severe, with psychotic features, and polysubstance dependence.  (R. 213).  Her global assessment of functioning ("GAF")[2] was scored as 45-51.  *Id.* A discharge document states that Perez left care against medical advice.  (R. 215).  A treatment document stated that Perez had been using methamphetamine and crack cocaine at the time of the incident that led to her hospitalization.  (R. 221).

Perez was hospitalized at Wagoner Community Hospital from August 31, 2005 to September 12, 2005 for amphetamine induced mood disorder and polysubstance abuse.  (R. 230-47).

Perez was hospitalized at Laureate Psychiatric Clinic and Hospital ("Laureate") from March 6, 2007 to March 12, 2007.  (R. 248-65).  Her Axis I diagnoses were polysubstance

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[2]The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*   A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

dependence, anxiolytic withdrawal, bipolar I disorder most recent episode depressed, severe, without psychotic features, and PTSD. (R. 251). There was a note to rule out opiate withdrawal. *Id.* Her current GAF was scored as 30, with a highest in the past year as 50. *Id.*

After the Laureate hospitalization, Perez followed up for treatment with Associated Centers for Therapy ("ACT") in March 2007. (R. 266-87). Her Axis I diagnoses at ACT were stated as bipolar disorder, most recent episode depressed, with psychotic features, and polysubstance dependence. (R. 274). Her GAF on March 30, 2007 was scored as 40, with an updated GAF of 51 on May 2, 2007. *Id.* She obtained medication management from ACT and followed up with the physician on a monthly basis from May to August 2007. (R. 287).

Perez was seen at the emergency room at Saint Francis Hospital from August through October 2007 with several episodes of abdominal pain. (R. 290-347). An ultrasound found that she had ovarian cysts. (R. 318).

Perez was seen by Christopher V. Moses, D.O. for lower back pain beginning on November 7, 2007. (R. 403-04). Dr. Moses prescribed Lortab on several occasions from December 2007 to July 2008. (R. 399-402).

Perez was seen at the OU Clinic by a psychiatrist for medication management on June 5, 2009. (R. 450-53). She was seen for follow up of bipolar I disorder and generalized anxiety disorder. *Id.* She denied manic or depressive symptoms. *Id.* She said that she had not had problems with her anxiety for the 3-week period before the appointment. (R. 451). Perez also denied substance abuse since before a hospitalization in December 2008. (R. 453). Her bipolar disorder was stated as being in full remission, and her GAF was scored as 72. (R. 452).

A document from Hillcrest Healthcare System states that Perez was discharged by Dr. Purdie, psychiatrist, on June 24, 2009 with medications. (R. 435-36).

After the Hillcrest hospitalization, Perez returned to the OU Clinic on June 30, 2009. (R. 446-49). She told her physician at the OU Clinic that she had discontinued her psychiatric medications and had then taken 25 Lortab in 2 days, resulting in hospitalization at Hillcrest from June 10 to June 24, 2009. (R. 446). Her diagnoses were stated as on June 5, 2009, but her GAF was scored as 56. (R. 448).

Perez had a follow-up appointment at the OU Clinic on July 14, 2009. (R. 442-45). The physician stated that Perez' diagnosis of generalized anxiety disorder had been carried over from her December 2008 hospitalization, and he was now discontinuing that diagnosis because her anxiety was a result of mood instability secondary to her bipolar disorder. (R. 445). Her GAF was stated as 72. (R. 444).

Perez was seen again at the OU Clinic on September 3, 2009, at which time she reported some manic symptoms. (R. 437-41). Her Axis I diagnoses were bipolar I disorder most recent episode manic, mild, and polysubstance dependence. (R. 439). Her GAF was stated as 56. *Id.*

Records show that Perez received outpatient services from Parkside Psychiatric Hospital & Clinic ("Parkside") from December 2009 to June 2010. (R. 455-93). She was assessed on December 23, 2009. (R. 455-56). On Axis I, her diagnosis was stated as bipolar I disorder, most recent episode mixed, and her GAF was scored as 45. (R. 456). The notes state that she had a psychotic episode in the previous month and had been hospitalized at Hillcrest for seven days. *Id.*

Perez was seen by a physician at Parkside on February 1, 2010, who gave the same diagnosis and GAF as at the December 23, 2009 assessment, and Perez was prescribed Geodon, Ambien, Effexor, propranolol, and clonazepam for anxiety. (R. 457-59).

Perez was seen at Parkside on March 1, 2010 for medication management by a physician. (R. 490). At an appointment on March 29, 2010, the physician agreed to start her on Xanax, at the request of Perez, who said that worked better than Klonopin in controlling her anxiety. (R. 489). At an appointment on May 3, 2010 with a physician's assistant, Perez reported that her anxiety was much better on Xanax, and she was given a refill of 90 pills. (R. 488). The physician's assistant gave her another 90-pill Xanax refill on May 28, 2010. (R. 486-87). An entry by the physician's assistant dated June 7, 2010 states that Perez was "ranting and screaming about being taken [off] xanax." (R. 486). An entry by a therapist dated June 9, 2010 states that Perez refused to go to the emergency room for evaluation of withdrawal from Xanax and noted that she had been given a month's worth of Xanax on May 28, but was already out of them. (R. 485-86). After Perez' father arrived at Parkside, Perez agreed to go to the hospital. *Id.*

On June 15, 2010, Perez was seen by a physician at Parkside, who noted that she had made an emergency room visit and had been hospitalized for dehydration after the June 7 and June 9 entries. (R. 484-85). The physician stated that Perez "clearly is unable to take Xanax or any benzodiazepine." (R. 485). At the time of the hospitalization, Perez was prescribed lithium, Effexor-XR, and propranolol, and the Parkside physician continued her on those medications. (R. 484).

Perez saw a therapist at Parkside on June 16, 2010, and June 24, 2010. (R. 483-84). Perez failed to keep appointments at Parkside in July and August 2010. (R. 482-83).

Perez was seen by agency consultant Seth Nodine, M.D., for a physical examination on July 15, 2008. (R. 405-10). Dr. Nodine recounted that Perez' chief complaint was bipolar disorder and that she denied any physical problems. (R. 405). His examination found no physical issues. (R. 405-10).

Perez was seen by agency examining consultant Denise LaGrand, Psy.D., for a mental status examination on May 13, 2008. (R. 373-80). Dr. LaGrand expressed concern that Perez reported that she had been prescribed Valium, even though she had episodes of Xanax dependence. (R. 377). She stated that Perez' physician should be extremely cautious in prescribing benzodiazepines. (R. 378). Dr. LaGrand found that Perez' memory was adequate, as was her ability to concentrate. *Id.* Her cognitive functioning was estimated to be in the average range, as was her ability to follow instructions. *Id.* Her ability to function independently was good, and her ability to communicate appropriately, to cope with typical demands of work-like tasks, and to sustain concentration was fair. *Id.* Dr. LaGrand stated Perez' Axis I diagnoses as major depressive disorder, moderate; bipolar disorder, by history; and generalized anxiety disorder. (R. 377). She scored Perez' GAF as 50. (R. 378).

Agency nonexamining consultant Burnard Pearce, Ph.D. completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on June 10, 2008. (R. 382-98). For Listing 12.04 on the Psychiatric Review Technique Form, Dr. Pearce noted depressive syndrome. (R. 385). For Listing 12.06, he noted Perez' diagnosis of generalized anxiety disorder. (R. 387). For Listing 12.09, Dr. Pearce noted that Perez had a long history of polysubstance abuse and inpatient admissions related to that abuse. (R. 390). For the "Paragraph B Criteria,"[3] Dr. Pearce found that Perez had moderate restriction of activities of daily living,

---

[3]There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with insufficient evidence regarding episodes of decompensation. (R. 392). In the "Consultant's Notes" portion of the form, Dr. Pearce summarized Perez' history of mental health treatment and discussed the various diagnoses. (R. 394). He summarized the results of Dr. LaGrand's examination. *Id.*

On the Mental Residual Functional Capacity Assessment, Dr. Pearce indicated that Perez was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 396). He also found a moderate limitation in the ability of Perez to interact appropriately with the general public. (R. 397). He found no other significant limitations. (R. 396-97). In his narrative summary, Dr. Pearce stated that Perez could understand, remember, and carry out simple one- and two-step tasks as well as lower level detailed tasks that were repetitive in nature. (R. 398). He found that Perez could deal with coworkers and supervisors in a superficial manner, but that she should avoid general contact with the public because that contact seemed to aggravate her anxiety symptoms. *Id.* He found that Perez could adapt to minor changes in the work setting. *Id.*

The administrative transcript includes documents titled "Mental Residual Functional Capacity Assessment" and "Mental Status Form" that are signed by George Blake, M.D., and dated November 11, 2008. (R. 413-16). Of 19 functional categories, Dr. Blake indicated that Perez had a marked limitation in 10 categories, with a moderate limitation in 4 categories. (R. 413-14). The handwriting on the Mental Status Form is somewhat difficult to read, but it appears that Dr. Blake wrote that Perez had a high level of anxiety and that her concentration was poor. (R. 415). He also appears to have stated that Perez should avoid all stressors. *Id.* He seems to have written that he recommended psychotherapy and medication management, but that he did

not expect much improvement. (R. 416). He also appears to have stated that Perez could not respond to work issues. *Id.* His diagnosis appears to be bipolar disorder, mixed type, with panic episodes. *Id.*

## Procedural History

Perez filed an application on March 18, 2008, seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 153-55). The application was denied initially and on reconsideration. (R. 71-77). A hearing before ALJ Charles Headrick was held February 16, 2010 in Tulsa, Oklahoma. (R. 28-65). By decision dated March 22, 2010, the ALJ found that Perez was not disabled. (R. 11-24). On September 7, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[4]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

At Step One, the ALJ found that Perez had not engaged in any substantial gainful activity since her application date of February 29, 2008. (R. 13). At Step Two, the ALJ found that Perez

---

(Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

had severe impairments of major depressive disorder, moderate, and/or bipolar disorder; anxiety disorder; and substance addiction disorder. *Id.* The ALJ stated that Perez' endometriosis and fibroid tumors were nonsevere. *Id.* He found her claims of back pain, ankle pain, and PTSD to be medically nondeterminable. *Id.* At Step Three, the ALJ found that Perez' impairments did not meet any Listing. (R. 14).

In his RFC determination, the ALJ found that Perez had the RFC to perform the full range of medium work, except that she "should be limited to simple, repetitive tasks and should have only occasional contact with the general public." (R. 15). At Step Four, the ALJ found that Perez could not return to her past relevant work. (R. 23). At Step Five, the ALJ found that there were jobs in significant numbers that Perez could perform considering her RFC, age, education, and work experience. *Id.* Therefore, the ALJ found that Perez was not disabled since the application date. (R. 24).

## Review

Perez makes four arguments that the ALJ's decision should be reversed. First, Perez argues that she was deprived of due process. Second, she argues that the ALJ did not include all impairments at Step Five and did not therefore state a proper hypothetical question to the vocational expert (the "VE"). Third, Perez argues that the ALJ did not properly consider the opinion evidence. Fourth, Perez faults the ALJ's credibility assessment. Regarding the issues raised by Perez, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

**Procedural Due Process**

Perez' first argument is that she was not provided procedural due process, arguing that the ALJ failed to make a full and fair inquiry and cited to evidence not in the record. In this section

of her brief, Perez also makes a claim of bias against the ALJ.

Social security hearings are subject to procedural due process considerations. *Yount v. Barnhart* , 416 F.3d 1233, 1235 (10th Cir. 2005); *Allison v. Heckler,* 711 F.2d 145, 147 (10th Cir.1983) (citing *Richardson v. Perales,* 402 U.S. 389, 401-02, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). Perez' first argument regarding due process is that the ALJ should have issued a subpoena to a business called "Slim Care." At the hearing before the ALJ, Perez testified that she had received diet pills at Slim Care that had subsequently caused her to go into a manic state and to be hospitalized. (R. 50-51). Perez' father testified that he had attempted to obtain records from Slim Care, but was not successful. (R. 58). Perez' counsel requested that the ALJ issue a subpoena to Slim Care. (R. 64). In his decision, the ALJ stated that he had given this request "due consideration." (R. 21). He then stated the following:

> The undersigned finds no basis to pursue medical records from Slim Care. The claimant is fully versed in her own substance abuse issues and voluntarily took amphetamines. Whether prescribed or non-prescribed, the claimant is in a fine position to make a decision about taking medication that is contraindicated in those with substance abuse problems.

(R. 22). Perez states that if records from Slim Care would have been subpoenaed, they would have shown that she had been prescribed medication. Plaintiff's Opening Brief, Dkt. #12, pp. 2-3.

While the undersigned finds that the ALJ's language is less than artful, the underlying premise is a permissible explanation that his decision regarding whether Perez was disabled did not depend on whether she had been prescribed diet pills or had taken unprescribed pills. In other words, the ALJ found that the records were not necessary to his decision.

An ALJ "has a basic duty of inquiry to fully and fairly develop the record as to material issues." *Baca v. Department of Health and Human Servs*., 5 F.3d 476, 479-80 (10th Cir. 1993).

Generally, an ALJ has a due to obtain "pertinent, available medical records which come to his attention during the course of the hearing." *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006), *quoting Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996). *Madrid* gives a contrasting situation to the one presented by Perez. In *Madrid*, the ALJ rejected the claimant's assertion that he suffered from a rheumatological disorder because there was no evidence in the record, while not obtaining the results of rheumatoid tests that he acknowledged had been performed. *Madrid*, 447 F.3d at 791. In the circumstances of the case, the Tenth Circuit held that it was error for the ALJ not to request the results of the tests from a medical provider. *Id*. Here, if the ALJ had subpoenaed the records from Slim Care, the only question that would have been answered would have been whether the diet pills that Perez took had been prescribed. This question was not a central one to the dispositive issue of whether Perez was disabled. The Slim Care records would not have shown that Perez was disabled.

Perez also argues that the ALJ should have ordered an additional consultative examination. The Tenth Circuit considered the ALJ's duty to develop in the context of the ALJ's discretion to order consultative examinations in *Hawkins v. Chater*, 113 F.3d 1162, 1166-70 (10th Cir. 1997). The court in *Hawkins* first noted that the ALJ has broad latitude in ordering consultative examinations. *Id.* at 1166. It summarized three instances in which a consultative examination might be required: (1) when there is a direct conflict in the medical evidence; (2) when the medical evidence is inconclusive; and (3) when additional tests are required to explain a diagnosis already contained in the record. *Id.* Perez does not explain which of these rationales required the ALJ to order another consultative examination. The ALJ found the report of Dr. LaGrand, together with the substantial records showing Perez' mental health and substance abuse treatment from 2005 through 2010 to be sufficient to decide the case. (R. 21-22). The Court

finds no error in the ALJ's decision on this point.

Finally, Perez faults the ALJ for not attempting to recontact Dr. Blake or to subpoena his records. The ALJ discounted Dr. Blake's opinion and gave it "very little weight" in part because Dr. Blake did not produce records in response to a request from the Social Security agency and because Dr. Blake did not explain the evidence that he had relied upon in stating his conclusions in two forms - a "Mental Residual Functional Capacity Assessment" and a "Mental Status Form." Perez argues in her brief that the ALJ "had the duty to follow up with Dr. Blake if he had questions or needed clarification of Dr. Blake's opinion that drug or alcohol abuse is not a material factor contributing to Claimant's inability to work," *citing McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002). Plaintiff's Opening Brief, Dkt. #12, p. 3. The ALJ's decision did not find that Perez' substance abuse was a material factor in her inability to work. Therefore, Perez' argument goes astray because it addresses a point that was not part of the ALJ's decision. Additionally, the undersigned finds that the ALJ did not have a duty to recontact Dr. Blake when Dr. Blake had not responded to a request from the agency to produce records. (R. 22). Moreover, Perez' counsel at the hearing was presumably aware that no records of Dr. Blake's treatment of Perez had been produced, and he did not request that the ALJ make another attempt to obtain those treatment records. When a claimant is represented by counsel, the ALJ can ordinarily rely on counsel to structure and present the claimant's case. *Hawkins*, 113 F.3d at 1166-67.

Perez also included a claim of bias in her argument that she did not receive due process from the ALJ. Perez based this claim on the previously-quoted language that she was "well versed in her own substance abuse issues and voluntarily took amphetamines." She also complained of the following language regarding Dr. Blake:

According to the evidence of [Perez'] mental health course, [Dr. Blake's] treatment of her was not particularly helpful, and may have actually been harmful in that he prescribed at least one highly addictive medication, Xanax. Xanax has a street value and could enable the procurement of other drugs [citation omitted]. The undersigned also takes administrative notice that a psychiatrist who refuses to tender a patient's records to a governmental agency in connection with a patient's claim of a mental impairment and a history of drug abuse, may very well be motivated to withhold records to protect what may be improper prescription writing or other practice issues.

(R. 22).

The undersigned finds that, while the ALJ's remarks are troubling, they are not sufficient to find that the ALJ was biased against Perez. In *Qualls v. Astrue*, 428 Fed. Appx. 841, 849 (10th Cir. 2011) (unpublished), the Tenth Circuit addressed the claimant's argument that the ALJ had demonstrated bias by two comments he made at the beginning of the administrative hearing. The court noted that the ALJ enjoyed a presumption of honesty and integrity. *Id.* The court agreed with the Commissioner's characterization of these as "stray" comments that did not show bias when viewed in the context of the entire hearing. *Id. See also Shivel v. Astrue*, 260 Fed. Appx. 88, 92-93 (10th Cir. 2008) (unpublished) (isolated evidentiary ruling that was "troubling" was not substantial evidence of bias).[5]

---

[5]Several other circuits have used the United States Supreme Court case of *Liteky v. United States*, 510 U.S. 540, 114 S. Ct. 1147 (1994) in the context of bias claims against ALJs in Social Security cases. *See Fraser v. Astrue*, 373 Fed. Appx. 222, 2010 WL 1434387 (3d Cir.) (unpublished); *Brown v. Apfel*, 192 F.3d 492, 500 (5th Cir. 1999); *Keith v. Barnhart*, 473 F.3d 782, 787-90 (7th Cir. 2007); *Perkins v. Astrue*, 648 F.3d 892, 902-04 (8th Cir. 2011); *Bayliss v. Barnhart*, 427 F.3d 1211, 1214-15 (9th Cir. 2005). *Bayliss* is representative of these cases, explaining that a claimant must show that the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment. *Bayliss,* 427 F.3d at 1214-15 (quotations and citations omitted). The Ninth Circuit found that the statements of the ALJ regarding perceived misconduct on the part of the claimant's attorneys were not sufficient to establish bias when the ALJ had written a 45-page detailed and reasoned opinion. *Id.* at 1215-16. Under this standard, the undersigned would find that the ALJ's comments here were not so extreme as to show a clear inability to render fair judgment.

The context here is a 14-page opinion that is thorough in discussing all of the evidence and that gives legitimate reasons for its findings. The ALJ should not have made the speculative comments that are the subject of Perez' complaints, but, in the context of the ALJ's decision as a whole, those comments were "stray" comments that did not address the central issues that decided the issue of whether Perez was disabled. The Court finds the ALJ's comments to be insufficient to show bias.

**Step Five Issues**

The arguments of Perez regarding Step Five are rather scattered and disjointed. This section of her brief is less than two pages long, but each sentence or two appears to be making a distinct, but undeveloped, argument. Plaintiff's Opening Brief, Dkt. #12, pp. 4-5. For example, Perez begins this section by stating that the ALJ did not include all of her impairments and therefore did not propound a proper hypothetical to the VE. She then states that the ALJ did not state the specific strength requirements in his hypothetical. Those appear to be different arguments, and the lack of development and lack of a transition between the two makes any meaningful analysis by this reviewing Court difficult. In *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009), the court discussed an argument related to the claimant's RFC. *Id.* The Tenth Circuit noted that at the district court level, the claimant had merely alleged, several times, that the ALJ had failed to consider the objective medical evidence. *Id.* The appellate court stated that "[b]ecause Claimant's counsel failed to present any developed argumentation in regard to Claimant's physical impairments, the district court obviously viewed this issue as waived." *Id.* The Tenth Circuit called the claimant's argument at the district court "perfunctory," and said that it had deprived that court of the opportunity to analyze and rule on that issue. *Id.* (quotation and citation omitted). Here, the undersigned finds that Perez' arguments in the section of her brief

related to Step Five are perfunctory and undeveloped to the point that this Court cannot give them meaningful review, and therefore, pursuant to *Wall,* a finding that these arguments have been waived is appropriate.

Even absent a finding of waiver, the Court would conclude that the ALJ's decision is adequate on these points. The two sentences of Perez' brief that state that the ALJ did not adequately specify the strength requirements in his hypothetical to the VE are not persuasive because the ALJ specified that Perez had the exertional capacity to do the full range of medium work. (R. 60-61). The exertional requirements of medium work are defined at 20 C.F.R. § 416.967(c), and the Court finds that it would be an unwarranted formality to require the ALJ to state all of the components that together are defined as medium work. *See Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005); *Westbrook v. Massanari*, 26 Fed. Appx. 897, 903 (10th Cir. 2002) (unpublished) (requirement of establishing demands of previous work at Step Four was not intended "to needlessly constrain ALJs by setting up numerous procedural hurdles that block the ultimate goal of determining disability"); *Wall*, 561 F.3d at 1068-69 (remand when ALJ completed extensive analysis of medical evidence would result in "needlessly prolonging" proceedings).

Perez then includes one sentence that says that the ALJ's hypothetical was incomplete. Plaintiff's Opening Brief, Dkt. #12, p. 4. The next sentences state that Perez had chronic pain, endometriosis, and PTSD. *Id.* Then, Perez states that the hypothetical did not include all severe and nonsevere impairments. *Id.* She then states that nonsevere impairments at Step Two cannot "disappear" between Step Two and Five. Id at 4-5. Perez' arguments are strange because impairments are not included in the RFC determination; instead, the functional limitations from the impairments are what constitute the ALJ's RFC determination. The ALJ's RFC

determination of medium work with the additional limitations that Perez "should be limited to simple, repetitive tasks and should have only occasional contact with the general public" is not contradicted by her diagnoses with chronic pain, endometriosis, and PTSD.

Perez' argument then mutates from the subject of an incomplete hypothetical to an argument that the ALJ mischaracterized the medical evidence by stating that there was no evidence to indicate that the claimant had been treated for chronic back or ankle pain or PTSD. The ALJ found that back pain, ankle pain, and PTSD were not medically determinable at Step Two. The ALJ was correct in his finding that there was no objective evidence in the records made available to him to support Perez' claims regarding back pain and ankle pain. There were no x-rays or other imaging that supported Perez' claim that she had been injured by her ex-husband, as she claimed in several medical records.

Perez complains that the ALJ's statement that she had not been treated for chronic pain was incorrect because she had been treated for chronic pain by Christopher V. Moses, D.O. It is true that the ALJ appears to have overlooked the six pages of records from Dr. Moses from November 2007 through July 2008 that consisted of one physical examination on November 7, 2007, and Lortab prescriptions for lower back pain, pain from fibroid tumors on her uterus and ovarian cysts, and right leg and ankle pain. (R. 399-404). The one physical examination by Dr. Moses, however, is not sufficient to establish an objective medical basis for Perez' claim of chronic pain. Except for the nine-month period of treatment by Dr. Moses, there are no medical records indicating that Perez saw any physician for pain management treatment. At times, she denied any physical medical issues. (R. 213, 258, 269, 274). In her initial treatment plan at ACT, dated March 30, 2007, Perez said that her physical health was good, did not list chronic pain as a physical condition, and said that she had normal physical day-to-day functioning. (R.

269). At other times, including the same ACT treatment plan, Perez reported that she had chronic pain issues resulting from the back, ankle, and head injuries that she said were inflicted by her ex-husband, but she does not appear to have asked for treatment of those issues. (R. 216, 227-29, 250, 257, 272, 286, 374). When Perez was examined by Seth Nodine, M.D., for a consultative examination, she affirmatively denied any physical problems. (R. 405). Dr. Nodine found no physical issues. (R. 405-10). Thus, while the ALJ was mistaken about the fact that Perez did receive treatment for chronic pain issues for the nine-month period in 2007 and 2008, this mistake is not sufficient to establish error in the ALJ's RFC determination, or his hypothetical to the VE. Stated another way, the longitudinal record is substantial evidence supporting the ALJ's RFC determination and his hypothetical to the VE.

The same is true of Perez' complaint that the ALJ misstated the record by stating that there was no evidence that Perez had been treated for PTSD. Perez cites to the records from the March 2007 hospitalization of Laureate, which do state PTSD as one Axis I diagnosis, listed after the other Axis I diagnoses of polysubstance dependence and withdrawal issues, and bipolar I disorder. (R. 251, 262). Again, this mistake does not negate the fact that the longitudinal record is largely absent of a formal diagnosis of PTSD. Additionally, there is also no indication that the functional limitations that would result from a diagnosis of PTSD would differ in any way from the functional limitations that resulted from the three severe impairments that the ALJ found of depression and/or bipolar disorder, anxiety disorder, and substance abuse disorder. Again, the longitudinal record constitutes substantial evidence supporting the ALJ's decision on these points.

Perez claims that her endometriosis and fibroid tumors were considered non-severe at Step Two, but they then "disappeared" in the ALJ's RFC determination and Step Five findings.

The undersigned rejects this argument. The ALJ discussed Perez' gynecological issues in his decision, and there is no indication that he did not include them in his consideration when he formulated Perez' RFC. (R. 19).

Perez' next tack is an argument that the ALJ engaged in improper picking and choosing of evidence. Plaintiff's Opening Brief, Dkt. #12, p. 5. The final sentence of this section of Perez' brief is typical of the undeveloped one-sentence assertions that make up her brief: "The ALJ must consider every medical opinion and his failure to include all severe and nonsevere impairments in the hypothetical is reversible error." *Id.* The undersigned finds that the ALJ's decision was thorough, and it adequately discussed all of the medical evidence. While Perez refers to medical opinions here, perhaps she misplaced that reference and intended it in her next section that addressed opinion evidence. In any case, for the reasons discussed above, the Court finds that the ALJ's hypothetical included all of the functional limitations that were supported by the record, and Perez' arguments to the contrary fail. *See, e.g., Qualls*, 428 Fed. Appx. at 850-51 (rejecting claimant's argument that the ALJ had omitted limitations in the RFC determination that resulted from nonsevere mental impairments); *Dray v. Astrue*, 353 Fed. Appx. 147, 150-51 (10th Cir. 2009) (unpublished) (evidence of mild mental impairments did not contradict ALJ's RFC determination omitting any limitations related to mental impairments).

**Medical Evidence**

Unfortunately, the next section of Plaintiff's Opening Brief also has undeveloped and disjointed arguments. Again, the undersigned finds that they are perfunctory and undeveloped, and therefore waived pursuant to *Walls*, 561 F.3d at 1066.

Even if the Court did not find that these truncated arguments were waived, they are not persuasive. The introductory sentence to this section of Perez' brief states that the ALJ "failed to

properly consider and weigh the medical source evidence." Plaintiff's Opening Brief, Dkt. #12, p. 5. Perez then states, correctly, that generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). Perez next states that it is error to fail to weigh all of the medical evidence. After this recitation of general legal principles, Perez finally explains that her grievance is that the ALJ only weighed the opinions of Dr. Blake and Dr. Pearce, failing to assign weight to the opinions of the consulting examiners. Perez gives no examples of the opinions of the consulting examiners which should have been weighed by the ALJ. Generally, consulting examiners do not give true opinion evidence. The Tenth Circuit in *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." Because Perez does not explain what portions of the reports of Dr. LeGrand and Dr. Nodine constituted opinion evidence, the Court is not able to address this argument.

Perez then transitions to a treating physician argument, complaining that the ALJ overlooked Dr. Moses' evidence. The Court has reviewed above the reasons why the ALJ's mistake in failing to include a description of the six pages of Dr. Moses' treatment of Perez for pain management for nine months was not reversible error given his thorough discussion of the longitudinal evidence. The records from Dr. Moses do not include any opinion evidence, because Dr. Moses never addressed functional limitations of Perez. *Cowan,* 552 F.3d at 1188-89.

Perez then complains that the ALJ did not follow the proper analysis for weighing a treating physician opinion when he considered the opinion evidence of Dr. Blake, citing *Goatcher v. U.S. Dept. of Health & Human Servs*., 52 F.3d 288, 290 (10th Cir. 1995). The Court finds this argument unpersuasive and finds that the ALJ's analysis was adequate and supported his decision to give Dr. Blake's opinion evidence "very little weight." (R. 22). The ALJ first explained that Dr. Blake had not produced any treatment records, in spite of efforts by the agency to obtain them. *Id.* He then stated that, without any treatment records to support them, Dr. Blake's opinions were conclusory.[6] *Id. See Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (approving ALJ's giving little weight to treating physician evidence when ALJ found that it was "brief, conclusory, and unsupported by objective medical findings"). The ALJ also noted that much of Dr. Blake's writing was illegible. The undersigned finds that the ALJ gave sufficient reasons for giving Dr. Blake's evidence little weight.

The ALJ did not commit any reversible error in his consideration of the medical evidence.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68

---

[6]The remainder of the ALJ's discussion related to Dr. Blake was addressed earlier in this Opinion and Order.

F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The first argument[7] Perez makes regarding credibility is placed in the section of her brief relating to the medical evidence. Plaintiff's Opening Brief, Dkt. #12, p. 7. Her argument, while not completely clear, appears to be that the ALJ required more objective medical evidence to support the subjective complaints of Perez than was legally justified. Regarding her mental complaints, Perez' argument appears to be that the ALJ should have discussed the evidence in her favor more than he did. The undersigned rejects this argument and finds that the ALJ's discussion of the treatment records and Perez' mental health history was adequate.

Perez' next argument appears to be that she was consistent in her reporting of symptoms, and this consistency should have been a factor in her favor in assessing credibility. The problem with this, of course, is that Perez was extremely inconsistent in many aspects of her physical and mental treatment, and the ALJ discussed those inconsistencies at length and found them to be a legitimate specific reason for finding that Perez was less than fully credible. The undersigned has discussed at some length the limited and inconsistent evidence related to Perez' claim of chronic pain. The failure of Perez to consistently seek treatment for chronic pain was undoubtedly part of why the ALJ overlooked the six pages, spanning nine months, reflecting that Perez received Lortab from Dr. Moses for her complaints of chronic pain. The ALJ noted the inconsistent reporting of Perez of her family history and her history of head injury and physical abuse from her ex-husband. (R. 20).

---

[7]In his decision, the ALJ found Perez to be less than fully credible. (R. 16). Perez faulted this language as meaningless boilerplate, but this sentence was merely an introduction to the ALJ's analysis and was not harmful. *See Kruse v. Astrue*, 2011 WL 3648131 at *6 (10th Cir.) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis").

The ALJ also noted the inconsistency of Perez' treatment records in that she appears to have not related her history of substance abuse to all treatment providers, including Parkside. *Id.* This failure of disclosure led to the Parkside providers prescribing Xanax to her, leading to her apparent use of 90 pills in 10 days, with subsequent hospitalization. (R. 485-88). The ALJ also found it significant that Perez appeared to be doing well when treated at the OU Clinic, but then stopped attending that clinic for treatment. (R. 20). The undersigned agrees with the ALJ that this pattern of moving from provider to provider for mental health services, even though treatment with one provider appears to be proceeding successfully, establishes a longitudinal picture that undercuts Perez' credibility. *See, e.g., Poppa v. Astrue*, 569 F.3d 1167, 1171-72 (10th Cir. 2009) (ALJ's conclusion that claimant had shown drug-seeking behavior was supported by evidence and undercut her credibility); *compare*, SSR 96-7p, 1996 WL 374186 at *7 ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense or persistent pain or other symptoms for the purposes of judgment the credibility of the individual's statements.").

Perez then returns to the subject of the opinion evidence of Dr. Blake, apparently because the ALJ stated as part of his credibility assessment that no treating physician, other than Dr. Blake, gave an opinion of Perez' functional abilities that was inconsistent with the ALJ's RFC determination. As stated above, the ALJ gave legitimate specific reasons for giving Dr. Blake's opinion evidence little weight. The ALJ's statement regarding the treating physicians was only a minor part of his credibility assessment, and Perez' attempt to resurrect Dr. Blake's opinion evidence here does not affect the adequacy of the ALJ's assessment.

Perez then criticizes the ALJ's statement that Perez appeared to have been less than fully compliant with her treatment at times. Perez argues that the ALJ can only use lack of compliance against her if she would have been able to work had she been fully compliant, citing *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987). Plaintiff's Opening Brief, Dkt. #12, p. 9. The Tenth Circuit has clarified that it is legitimate for an ALJ to use lack of compliance with treatment as a factor in finding that the claimant's claim of disabling pain is not credible, and that use is distinct from the use in *Frey* of refusal to follow prescribed treatment to deny benefits. *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000); *see also Sims v. Apfel*, 172 F.3d 879 *3 (10th Cir. 1999) (unpublished) (failure to follow doctors' instructions was a factor in determining credibility). Here, it is legitimate that the ALJ found Perez' lack of compliance with all recommended treatment to undercut her claim that her mental illness and substance abuse were disabling.

Perez then returns to the subject of her chronic pain, stating that the ALJ should have considered her claim more closely. Plaintiff's Opening Brief, Dkt. #12, pp. 9-10. The undersigned rejects the claim of Perez that the ALJ did not sufficiently discuss or consider her prescribed medications. The ALJ's decision recites the extensive medications prescribed for Perez' mental health issues in detail. (R. 16-19). Regarding her claim of chronic pain, her failure to seek treatment for this condition, with the exception of the nine-month period she was treated by Dr. Moses, undercuts her credibility. The failure to be diligent in seeking treatment for an impairment that the claimant asserts is disabling is a legitimate factor for the ALJ to cite in making a credibility assessment. *Qualls*, 206 F.3d at 1372-73 (failure to seek treatment was legitimate reason for ALJ's credibility assessment); *Harris v. Astrue*, 285 Fed. Appx. 527, 531 (10th Cir. 2008) (unpublished) (claimant's failure to return to neurosurgeon for treatment when

her pain became more severe was one legitimate reason supporting the ALJ's credibility assessment). The ALJ's failure to discuss the records of Dr. Moses or to discuss Perez' claim of chronic pain in more detail is not reversible error, because his credibility assessment remains supported by substantial evidence.

Perez then transitions to an argument that she was not able to work on a sustained basis. Obviously, the ALJ rejected this subjective claim, and none of the evidence that Perez cites is sufficient to require the ALJ to make a finding that Perez could not work on a sustained basis. While this section of Perez' brief was stated as addressing credibility issues, Perez' next assertion is that the ALJ could not ignore the unfavorable answer from the VE that if Perez' testimony were fully credible, she would be unable to work. Given the supported finding of the ALJ that Perez was not fully credible, the VE's testimony regarding the consequences of a finding that she was fully credible is obviously not relevant. *See Barrett v. Astrue*, 340 Fed. Appx. 481, 488 (10th Cir. 2009) (unpublished) (testimony of VE regarding limitations that were not ultimately included in the ALJ's RFC was not relevant); *Roulston v. Shalala*, 46 F.3d 1152 *1 (10th Cir. 1995) (unpublished) (ALJ did not ignore unfavorable testimony that was elicited by claimant's attorney and based on subjective complaints that the ALJ ultimately found not credible). The last sentence of this section states that the ALJ's credibility assessment was not supported by substantial evidence because he had searched the record for "isolated bits of evidence supporting a preconceived conclusion." Plaintiff's Opening Brief, Dkt. #12, p. 10. The undersigned, to the contrary, finds that the ALJ's decision includes a comprehensive discussion of the evidence. The credibility assessment was legally sufficient and was supported by substantial evidence.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 24th day of February, 2012.

Paul J. Cleary
United States Magistrate Judge